# EXHIBIT D

Jasmine Hayes                                                October 13, 2017

```
 1             SUPERIOR COURT OF THE STATE OF CALIFORNIA
 2               COUNTY OF SAN DIEGO, CENTRAL DIVISION
 3
    _____
 4                                  )
    JASMINE HAYES, on behalf of     )
 5  herself and on behalf of        )
    other current and former        )
 6  employees; KHADIJAH SIEF, on    )
    behalf of herself and on        )
 7  behalf of other current and     )
    former employees,               )
 8                                  )
                  Plaintiffs,       )
 9                                  )
       vs.                          ) Case No.:
10                                  ) 37-2015-00011803-CU-BT-CTL
    RED EYED JACK'S SPORTS BAR,     )
11  INC. dba CHEETAHS GENTLEMEN'S   )
    CLUB or CHEETAHS NIGHTCLUB, a   )
12  Nevada Corporation; SUZANNE     )
    COE, an individual, and DOES    )
13  1 through 100, inclusive,       )
                                    )
14                Defendants.       )
    _____)
15
16          VIDEOTAPED DEPOSITION OF JASMINE HAYES
17                   San Diego, California
18                Friday, October 13, 2017
19                         Volume 1
20
21
22  Reported by:
    Claire A. Wanner
23  CSR No. 12965, RPR, CRR
    Job No. 30378
24
25  Pages 1 to 169
```

Jasmine Hayes                                                October 13, 2017

```
 1   at Red Eyed Jack's?
 2        A.   No.
 3        Q.   How were the days that you performed at
 4   Red Eyed Jack's selected?
 5        A.   Well, I couldn't decide what I wanted to do,
 6   but if I -- if they didn't want me to work that day,
 7   then I wasn't working that day.  And I gave you an
 8   example as far as my friend.  That was just an example.
 9   The shift -- for any reason, since it's a strip club
10   rules, you know, if he doesn't want me to work that day,
11   he can simply say no, so --
12        Q.   Well, let's back up a little bit.
13             Was there some sort of written schedule that
14   you were handed out every week or how did you know what
15   days to show up?
16             MS. WELLS:  Compound.
17             THE WITNESS:  I mean, I let him know what days
18   I would and if I could.  Would and could.
19   BY MR. SACCUZZO:
20        Q.   Okay.  So let's break that down a little bit.
21        A.   Okay.
22        Q.   You told Barry what days that you wanted to
23   work and could work; correct?
24        A.   He -- I told him what days I wanted to work.
25   He told me the days I could work.
```

Jasmine Hayes                                                October 13, 2017

1   Q.  Okay.  What days did you tell him you wanted to
2   work?
3   A.  I told him I like day shifts, and since he let
4   me know his shifts were the best, I wanted to work his
5   as well.
6   Q.  Okay.  So basically your wants and his desires
7   coincided; correct?
8   A.  I don't know what coincide means.
9   Q.  There was no disagreement as to the days that
10  you would perform; correct?
11  A.  Sometimes, yes.
12  Q.  Can you give us an instance when there was a
13  time when you wanted to perform but were not allowed to
14  perform?
15  A.  There was a time I came a little late and he
16  didn't let me perform.  He didn't let me work that day
17  too, because I was a little late.
18  Q.  How late were you?
19  A.  Well, as far as the fee schedule goes, the
20  latest you could come I think -- because a shift started
21  at like around 7:00 or 6:00, I was, like, a few minutes
22  late.  I wasn't even that much late, and I had to go
23  back to the back and get dressed.  So even if I come in
24  slightly on time, I still have to get dressed and get
25  ready, which makes me late.  And the way his attitude

Jasmine Hayes                                              October 13, 2017

1   who was let go or somehow barred from the -- from
2   Red Eyed Jack's for not performing on stage?
3       A.  I've seen girls get fired for many reasons, and
4   that includes one of them, yes.
5       Q.  Are there any examples or any performers that
6   you can recall that were fired from Red Eyed Jack's for
7   not performing on stage?
8       A.  None that I can recall specifically.
9       Q.  Okay.  So your name gets called, you perform on
10  stage.  You mentioned that you select songs.
11          How did that work?
12      A.  Well, you let them know what song you'd like to
13  dance to, and they let you know if you can or not.
14      Q.  Was there ever an instance where you wanted to
15  perform to a certain song and were told you couldn't?
16      A.  Oh.  Well, most of the time, yes.
17      Q.  Okay.  What was the basis of the objection?
18      A.  Hip-Hop.  They didn't want you to play Hip-Hop.
19      Q.  Did they explain why?
20      A.  I guess the clientele probably didn't like it.
21  That's along the lines they told me.
22      Q.  Excluding Hip-Hop from the categories of songs
23  that you could perform to, were there any other songs
24  that you wanted to perform to but were told you
25  couldn't?

1  A. No.
2  Q. So it seems that they were biased against
3  Hip-Hop for whatever reason.
4  A. Correct.
5  Q. Now, with respect to your actual performances
6  on stage, were you instructed how to perform them in any
7  way?
8  A. Yes.
9  Q. And who instructed you?
10 A. The managers.
11 Q. And how did they instruct you?
12 A. Let you know what you're not supposed to do on
13 stage.
14 Q. And what were you not supposed to do on stage?
15 A. Certain areas you can't touch, certain
16 suggestive things that you're not supposed to do.
17 There's bounds that you're supposed to stay in when
18 you're on stage. You can't touch a customer while
19 you're on stage. There's a certain time you're supposed
20 to take off your top. And when you take off your
21 bottoms, where not to go, you know, not too close. And
22 you cannot be naked off stage at all.
23       MR. SACCUZZO: Why don't we let him switch and
24 then we'll resume.
25       THE VIDEOGRAPHER: We're off record at

Jasmine Hayes                                              October 13, 2017

```
 1        Q.   So is it a fair statement that the rules that
 2   you were being told to follow while performing on stage
 3   essentially were the rules of the San Diego
 4   Municipal Code?
 5             MS. WELLS:  Misstates prior testimony.
 6             You can answer.
 7             THE WITNESS:  Yeah, generally.  They had some
 8   the same, so I would say yes.
 9   BY MR. SACCUZZO:
10        Q.   So after doing a stage performance, you would
11   receive money; right?
12        A.   Yes.
13        Q.   How would you get that money?
14        A.   From the customers.
15        Q.   So they liked your performance, they give you
16   money; right?
17             MS. WELLS:  Calls for speculation.
18   BY MR. SACCUZZO:
19        Q.   Were there times where maybe you did a
20   performance and they didn't like it, and you got less
21   money or no money at all?
22             MS. WELLS:  Same objection.
23             You can answer.
24             THE WITNESS:  Yeah, sometimes.
25
```

1    Q.  And was it required that you show your -- your
2  performer's permit each time you went to perform?
3    A.  Yes.
4    Q.  And that's actually a pretty common thing in
5  San Diego; correct?
6        MS. WELLS:  Objection.  Calls for speculation.
7        THE WITNESS:  I wouldn't know.  I've only
8  danced there.  I mean, with the dancer's license, I
9  didn't have a dancer's license at Pacers.  Didn't need
10 one.
11 BY MR. SACCUZZO:
12   Q.  You mentioned a couple times the $20 room.
13       How is that different than the VIP rooms?
14   A.  The VIP room, you're required to get at least
15 five dances.  The other room, all you're required is for
16 one.  You can stay as long as you want, but the
17 requirement to go back there.
18   Q.  So was there any fee schedule that you would
19 apply to the patrons that you were giving performances
20 to?  So if you were in the VIP room, did you get -- was
21 there a fee schedule that you would give them or how
22 would that work?
23       MS. WELLS:  Vague as to fee schedule.
24 BY MR. SACCUZZO:
25   Q.  How did the patrons who went with you to the

1   VIP room know how much to pay you?
2       A.  It was on the walls before you walk in.
3       Q.  And when you say it was on the walls, so what
4   was on the wall relative to the VIP room?
5       A.  The amount of the dance.
6       Q.  And what was that, if you can recall?
7       A.  One dollar for -- I mean, one song, $20.  And
8   then the VIP room, five songs or four songs for 100.
9       Q.  Could patrons pay more than that schedule?
10          MS. WELLS:  Calls for speculation.
11          You can answer if you know.
12          THE WITNESS:  I'm sure they could.
13  BY MR. SACCUZZO:
14      Q.  Were there instances where patrons paid you
15  more than that amount of money?
16      A.  Like a tip?
17      Q.  Well, say the -- for the VIP room, five songs,
18  $100, did you ever go to the VIP room and get more than
19  $100 for five songs?
20      A.  If they tipped me, that's the only way.
21      Q.  Now, with respect to the $100 that you received
22  in the VIP room, did you have to give any of that money
23  to Red Eyed Jack's?
24      A.  Yes.
25      Q.  How much of that would you give to

Jasmine Hayes                                                October 13, 2017

1  Red Eyed Jack's?
2      A.  You calculate how much money you made at the
3  end of the night, and you use the tip-out chart to
4  determine who gets what and how much of that do they
5  get.
6      Q.  Do you have a copy of this tip-out chart?
7      A.  I do not.
8      Q.  What was the tip-out chart?
9          What was the schedule of the tip-out chart, to
10 the best of your recollection?
11     A.  Well, they just really -- there's, like, a lot
12 of columns.  So if you made this much, this is how much
13 you tip out to the manager.  The manager always got the
14 bigger percentage.  This is how much you tip out to the
15 door guy and the DJ.
16     Q.  Okay.  So is it fair to say that all the money
17 would be collected by you, and then this tip-out chart,
18 you would apply that as far as any money to return back
19 to anybody at Red Eyed Jack's; correct?
20     A.  Correct.
21     Q.  Was there ever an instance where you did not
22 follow that tip-out chart?
23     A.  No.
24     Q.  Are you aware of any performers who did not
25 follow that tip-out chart?

1      A.   No.
2      Q.   Do you know what would happen if you did not
3  follow that tip-out chart?
4           MS. WELLS:   Calls for speculation.
5           THE WITNESS:   Yes.
6  BY MR. SACCUZZO:
7      Q.   And what is your understanding of what would
8  occur?
9      A.   Well, my friend almost got fired for that,
10 because Vinnie had said that she didn't tip out, but we
11 know she did.  She remembered doing it and everything,
12 so she pretty much got fired.  He let her work again and
13 replace the money that he said she did not give, or else
14 she would have been fired.
15     Q.   And who was this performer?
16     A.   Paris.
17     Q.   Other than that one instance, are you aware of
18 any other instance where a performer did not follow the
19 tip-out chart?
20     A.   No.
21     Q.   And aside from the money that would be paid
22 pursuant to the tip-out chart, did you get to keep the
23 balance?
24     A.   Can you repeat that, please?
25     Q.   Sure.

Jasmine Hayes                                                      October 13, 2017

1       A.   Correct.
2       Q.   Anything else?
3       A.   No, not that I haven't already mentioned.
4       Q.   Okay.  Flipping to the next page, page 14,
5  talks about setting procedures for checking out,
6  including about tipping out the DJ, door, and manager.
7            Is that what you're referring to on the tip-out
8  chart?
9       A.   Yes.
10      Q.   Do you recall the percentages that were
11 required by that tip-out chart as you sit here?
12      A.   The majority went to the manager.  I believe
13 that was 10 percent.
14      Q.   So how much would you actually be tipping out
15 of whatever you brought in?
16      A.   According to the paper, it looks like a
17 20 percent all the way.
18      Q.   So your recollection, it was 10 percent to the
19 manager, and then who would get the remaining
20 10 percent?
21      A.   DJ, door guy.
22      Q.   Would they get 5 percent each?
23      A.   I don't know.  I really followed the chart and
24 it looks that way, about 5 percent each.
25      Q.   Okay.  Would you physically hand them the money

Page 148
LITIVATE REPORTING + TRIAL SERVICES | 877.771.3312 | litivate.com

Jasmine Hayes                                                October 13, 2017

```
 1   or how would they get the money?
 2        A.   I would hand it to them.
 3        Q.   So you would hand 10 percent to the manager,
 4   and then 5 percent to the door, and then 5 percent to
 5   the DJ?
 6        A.   Yeah.  On the chart, it says if you made $200,
 7   and in a little column, give this to the manager,
 8   amount.  Give this to the door guy.  There's an amount.
 9   Give this to the DJ.  So that's -- specific amount on
10   that paper, I give it to them.
11        Q.   Okay.  And you would physically do that;
12   correct?
13        A.   Yes.
14        Q.   Looking at subsection H, is that essentially
15   the same as subjection G, it seems like, what you have
16   to pay out to the DJ, door, manager?
17             Or is that something different, to your
18   recollection?
19        A.   The house fee.
20        Q.   What's the house fee?
21        A.   You have to pay to work there.  You have to pay
22   a house fee.
23        Q.   Okay.  That's something we haven't talked
24   about.
25             What was the house fee?  Explain that to me.
```

1      A.   It depends on what time, what shift you did.
2  But the house fee would range from, I think, 50 to 60 or
3  $70.
4      Q.   So how did the ranges work?
5      A.   By what shift you chose to work.
6      Q.   And when would you pay the house fee?
7      A.   I would pay the house fee at the end of the
8  night -- or actually when I got it.  I don't think they
9  regulated when you paid the house fee.  It just had to
10 be during your shift.
11     Q.   And who did you pay the house fee to?
12     A.   I paid the house fee to the house mom.
13     Q.   Who's the house mom?
14     A.   I don't remember her name.
15     Q.   What did she do with the money?  Do you know?
16     A.   No.
17     Q.   And just for the clarification on the record,
18 house mom is a pretty common term in the industry;
19 correct?
20     A.   I suppose so.
21     Q.   Yeah.  What does a house mom typically do?
22          MS. WELLS:  Calls for speculation.
23 BY MR. SACCUZZO:
24     Q.   If you know?
25     A.   I don't know in general, but what this one did,

Jasmine Hayes                                                October 13, 2017

1    I, the undersigned, a Certified Shorthand
2    Reporter of the State of California, do hereby certify:
3         That the foregoing proceedings were taken
4    before me at the time and place herein set forth; that
5    any witnesses in the foregoing proceedings, prior to
6    testifying, were administered an oath; that a record of
7    the proceedings was made by me using machine shorthand
8    which was thereafter transcribed under my direction;
9    that the foregoing transcript is a true record of the
10   testimony given.
11        Further, that the foregoing pertains to the
12   original transcript of a deposition in a Federal Case,
13   before completion of the proceedings, a review of the
14   transcript [ ] was [ ] was not requested.
15        I further certify I am neither financially
16   interested in the action nor a relative or employee of
17   any attorney or any party to this action.
18        IN WITNESS WHEREOF, I have this dates
19   subscribed my name.
20
21
22   Dated: November 1, 2017
23                                    _____
24                                    CLAIRE A. WANNER
25                                    CSR No. 12965, RPR, CRR

Jasmine Hayes                                                October 13, 2017

1              DECLARATION UNDER PENALTY OF PERJURY
2
3
4          I, JASMINE HAYES, the witness herein, declare
5     under penalty of perjury that I have read the foregoing
6     in its entirety; and that the testimony contained
7     therein, as corrected by me, is a true and accurate
8     transcription of my testimony elicited at said time and
9     place.
10
11          Executed this __27th__ day of __November__ 2017, at
12     _____San Diego_____, _____California_____.
13            (City)                    (State)
14
15
16
17                                    _[signature]_
18                              _____
19                                  JASMINE HAYES
20
21
22
23
24
25