UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CIERRA DAVIS, on behalf of herself and on behalf of other current and former employees similarly situated et al.,<br><br>　　　　　　　　　　　　Plaintiffs,<br><br>v.<br><br>RED EYE JACK'S SPORTS BAR, INC., a Nevada Corporation doing business as Cheetahs Gentleman's Club, doing business as Cheetahs Nightclub, et al.,<br><br>　　　　　　　　　　　　Defendants. | Case No.: 3:17-cv-01111-BEN-JMA<br><br>**ORDER:**<br><br>**(1) DENYING DEFENDANTS' MOTION TO COMPEL ARBITRATION;**<br><br>**(2) GRANTING IN PART DEFENDANTS' REQUEST FOR STAY** |

Before this Court is Defendant Red Eye Jack's Sports Bar, Inc. ("Cheetahs") and Suzanne Coe's motion to compel arbitration and stay action as to Plaintiff Cierra Davis ("Davis"),[1] which Defendant Rich Buonantony joins. (Docket Nos. 32, 34.) The motion is fully briefed. For the reasons set for below, the Defendants' motion to compel

---

[1] According to the Third Amended Complaint ("TAC"), Davis and Amber Moore ("Moore") are the two named plaintiffs in this purported "hybrid collective action" under the federal Fair Labor Standards Act ("FLSA") and putative class action for alleged violations of California state law. (Docket No. 29, TAC ¶ 1.)

arbitration is **DENIED**, and Defendants' request to stay the action is **GRANTED in part**.

## BACKGROUND[2]

Defendant Cheetahs is an all-nude strip club. It is open seven days a week, from 12:00 p.m. to 2:00 a.m. At all relevant times, Defendants Suzanne Coe ("Coe") and Rich Buonantony ("Buonantony") owned, operated, controlled, and/or managed Cheetahs. Davis alleges Coe and Buonantony are alter egos of Cheetahs, and that Buonantony is also a managing agent of Cheetahs.

In June 2014, Cheetahs hired Davis as an adult entertainer or dancer. Davis worked at Cheetahs "about seven days per week, from approximately 6:00 p.m. to 2:00 a.m." (TAC ¶ 8.) Davis alleges Defendants "refused to compensate [her] as a dancer for her time working at the club. Among other things, [she] never received minimum wage or any other compensation from Cheetahs." (*Id.*) Davis generated income solely through tips and/or gratuities received from patrons when she performed dance services.

In essence, Davis alleges Defendants misclassified, and continue to misclassify "all of their employees who work as adult entertainers, including [Davis], as 'independent contractors.'" (*Id.* ¶ 23.) "As a result of this uniform misclassification, [Davis] and [her] fellow dancers were denied minimum wages required under the FLSA and the California Labor Code and, therefore, suffered injury and incurred financial loss." (*Id.*) Davis also alleges Cheetahs wrongfully required her to pay "a daily 'house fee' simply for showing up for work," wrongfully "skimmed" her tips and gratuities by requiring her to pay "fees or tip-out a substantial percentage of all [her] daily earnings to 'the DJ' and/or 'door'

---

[2] Because Defendants' motion only seeks to compel arbitration as to Davis's claims, the following overview of the facts is drawn from the relevant allegations of the TAC as they relate to Davis, which the Court assumes true for purposes of evaluating Defendant's motion. *Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1118 (9th Cir. 2011) ("Because this case is still at the pleading stage, we assume the facts alleged in the complaint to be true.").

2

and/or 'manager," and failed to provide her meal and rest breaks. (*Id.* ¶¶ 26-30.) Approximately 20% of Davis's tips and gratuities "go back to Cheetahs." (*Id.* ¶ 33.)

Davis asserts these facts give rise to claims against Defendants for: (1) violation of 29 U.S.C. § 206(a) (failure to pay minimum wage under the FLSA); (2) violation of multiple sections of the California Labor Code for failure to pay wages, overtime, provide adequate rest and meal breaks, and reimbursement of necessary work expenditures; and (3) conversion.

Defendants move for arbitration on the grounds that Davis agreed to submit the claims she alleges in the TAC to binding arbitration. Davis responds that Ninth Circuit authority requires the Court find the arbitration agreement upon which Defendants rely is invalid and unenforceable.

## LEGAL STANDARD

Section 2 of the Federal Arbitration Act ("FAA") states that:

> A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2. Section 2 demonstrates "'a national policy favoring arbitration of claims that parties contract to settle in that manner." *Preston v. Ferrer*, 552 U.S. 346, 352–53 (2008) (citing *Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984)).

Under Section 3 of the FAA, where an issue involved in a suit or proceeding is referable to arbitration under an agreement in writing, the district court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement . . . ." 9 U.S.C. § 3. The language is mandatory, and district courts are required to order arbitration on issues as to which an arbitration agreement has been signed. *Kilgore v. KeyBank*, *N.A.*, 718 F.3d 1052, 1058(9th Cir. 2013) (citing *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985)). The role of the district court is "limited to determining (1) whether a valid

agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue." *Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000).

An agreement to arbitrate is "valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Under California law, the elements of a valid contract are (1) parties capable of contracting; (2) mutual consent; (3) a lawful object; and (4) consideration. Cal. Civ. Code § 1550. However, a court will not enforce an otherwise valid contract if there exists a viable defense, such as illegality. 1 Witkin, Summary 10th (2005) Contracts, § 331, p. 365.

## DISCUSSION

**A.   The Arbitration Agreement is Invalid and Unenforceable**

In support of their motion to compel arbitration, Defendants submitted a copy of an "Entertainer Performance Space Lease," which they represent Davis executed on November 18, 2013, and a copy of an "Arbitration Agreement," which they represent Davis executed on May 3, 2015. (*See* Mot. at p. 2[3]; Docket No. 32-3, Declaration of Rich Buonantony ("Buonantony Decl."), Ex. A.)[4] The last page of the "Entertainer Performance Space Lease" includes the following arbitration provision:

> Other than the provisions contained in this agreement relating to agreement to indemnify, defend and hold **OWNER** harmless, all disputes between **PERFORMER** and OWNER [sic] shall be submitted to binding arbitration in accordance with the Commercial Dispute Arbitration Rules of the American Arbitration Association. Any dispute that can be litigated in Small Claims Court is excepted from the requirement of binding arbitration.

---

[3] Unless otherwise noted, the Court's reference to a page number is to the page number generated by the CM/ECF system.

[4] Davis does not dispute or object to the authenticity of these documents or Defendants' representation that she signed them.

(Buonantony Decl., Ex. A at p. 7.)

By its own terms, the "Arbitration Agreement" "supersedes any and all other agreements, whether oral or written between the Parties with respect to arbitration of any disputes." (*Id.* at p. 9.) It provides:

> 1. In the event of any dispute between Cheetahs (Owner) and Performer (the Parties) [sic], the Parties agree to submit the dispute for binding arbitration in accordance with the Commercial Dispute Arbitration Rules of the American Arbitration Association. Any dispute that can be litigated in Small Claims Court is excepted from the requirement of binding arbitration.
>
> . . .
>
> 3. Only individual claims may be brought. Neither the Owner nor Performer will bring or participate in a class action.
>
> . . .
>
> 6. Each and every provision of this arbitration agreement is severable and independent of any other term or provision of this arbitration agreement and any other agreement between Owner and Performer, including but not limited to the Entertainer Performance Space Lease.
>
> . . .
>
> 8. The parties agree that, notwithstanding the date in which the parties entered into this arbitration agreement, its terms shall be applied retroactively to the time that the parties first entered into any relationship.

(*Id.*) There is no dispute that Davis signed the "Arbitration Agreement" or that it covers her claims against Defendants. The parties only dispute whether the "Arbitration Agreement" is valid and enforceable.[5] The Court agrees with Davis that it is neither.

---

[5]Although Defendants' motion references the arbitration provisions of both the "Entertainer Performance Space Lease" and the "Arbitration Agreement," Defendants'

5

3:17-cv-01111-BEN-JMA

As Davis points out, in *Morris v. Ernst & Young, LLP*, 834 F.3d 975 (9th Cir. 2016), *cert. granted*, 137 S. Ct. 809 (Mem.) (January 13, 2017) (No. 16-300), the Ninth Circuit determined that the National Labor Relations Act ("NLRA") establishes a core right to concerted activity,[6] which "precludes contracts that foreclose the possibility of concerted work-related legal claims." *Id.*, 834 F.3d at 989-90. Thus, the provision in the arbitration agreement at issue in *Morris* that required employees to resolve all of their legal claims in "separate proceedings" (*i.e.*, a concerted action waiver) was found to be unenforceable because it both "prevents concerted activity by employees in arbitration proceedings" and requires employees to only use arbitration, which effectively prevents the employees from initiating concerted legal action anywhere else. *Id.* at 983-84.

Here, Defendants do not deny that the "Arbitration Agreement" contains a concerted action waiver. Instead, Defendants essentially argue that the determination of whether Davis was an employee (and thus whether *Morris* renders the concerted action waiver unenforceable) is for the arbitrator to decide. The Court disagrees.

First, as noted above, for purposes of evaluating Defendants' motion to compel arbitration, the Court need not decide whether Davis is an employee; this allegation is assumed true. *See Smallwood*, 660 F.3d at 1118 ("Because this case is still at the pleading stage, we assume the facts alleged in the complaint to be true."). Second, it is undisputed that the "Arbitration Agreement" broadly includes "any dispute between Cheetahs (Owner) and [Davis]," including Davis's alleged FLSA and California Labor

---

motion relies on the arbitration provision in the Arbitration Agreement." (Mot. at p. 7) ("the Arbitration Agreement is valid, enforceable, and irrevocable, and the [Defendants] therefore respectfully submits the Court has only very simple task before it – allow the matter to proceed to arbitration per the agreement of the parties.") Moreover, paragraphs 7 and 8 of the "Arbitration Agreement" clearly state that the "Arbitration Agreement" superseded all prior arbitration agreements and applied retroactively. (Buonantony Decl., Ex. A at p. 9.)

[6] The right to concerted activity is "the right of employees to act together." *Morris*, 834 F.3d at 980.

Law claims. Accordingly, the Court's analysis of the validity of the "Arbitration Agreement" necessarily includes consideration of whether Davis has raised a valid contract defense, *i.e.*, whether the concerted action waiver renders the "Arbitration Agreement" unenforceable. *See Morris*, 834 F.3d at 984-90.

Assuming Davis is an employee, the Court finds the concerted action waiver invalid and unenforceable because, like the same clause in *Morris*, it clearly prevents Davis from participating in concerted activity in *any* forum. Indeed, Defendants acknowledge this effect. (*See* Mot. at p. 7) ("Here, the Arbitration Agreement . . . provide[s] . . . in the event of *any* dispute between Davis and [Defendants], Davis agreed to pursue that matter *only* through arbitration . . . [.] Moreover, Davis even agreed that she could only pursue individual claims . . . [.]") (emphasis in original.) The Ninth Circuit expressly found this type of provision precluded by the NLRA. *Morris*, 834 F.3d at 989 ("Irrespective of the forum in which disputes are resolved, employees must be able to act in the forum *together*.") (emphasis in original).

Although the "Arbitration Agreement" contains a severability clause, the Court further agrees with Davis that the concerted action waiver is not severable. As at least one district court in this district, and district courts in other districts have concluded, severing the concerted action waiver "would amount to compelling arbitration on a class wide basis." *Rodriguez v. Jerome's Furniture Warehouse*, No. 3:17-CV-00460-L-NLS, 2017 WL 3131845, at *3 (S.D. Cal. July 24, 2017); *see also Mackall v. Healthsource Glob. Staffing, Inc.*, No. 16-CV-03810-WHO, 2016 WL 6462089, at *5 (N.D. Cal. Nov. 1, 2016) (same). But the Supreme Court has held that the FAA does not permit a district court to compel a party to class arbitration "unless there is a contractual basis for concluding that the party *agreed* to do so." *Stolt-Nielsen S.A. v. Animal Feeds Int'l Corp.*, 559 U.S. 662, 684 (2010) (emphasis in original). Thus, in light of the "Arbitration Agreement's" explicit prohibition against concerted activity, and Defendants' apparent opposition to the same (*see* Mot. at p. 7), the Court has no contractual basis for concluding Defendants and Davis agreed to submit to class arbitration. *See Rodriguez*,

7

2017 WL 3131845, at *3 (citing *Gonzalez v. Ceva Logistics, U.S., Inc.*, 2016 WL 6427866, at *7 (N.D. Cal. Oct. 31, 2016)); *Mackall*, 2016 WL 6462089, at *5 (holding the same). Therefore, the Court finds the concerted action waiver renders the entire arbitration agreement unenforceable. *Id.* (concluding the same).

**B.     A Stay of Davis's Claims Pending the Outcome of *Morris* is Warranted**

In reply, Defendant requested a stay of the action until the Supreme Court decides *Morris*.[7] Contrary to Davis's contention otherwise, the Court has discretion "to enter a stay of an action before it, pending resolution of independent proceedings which bear upon the case." *United States v. Greek*, No. 14-CR-00605-TEH, 2016 WL 5243408, at *1 (N.D. Cal. Aug. 10, 2016) (quoting *Leyva v. Certified Grocers of Cal.*, 593 F.2d 857, 863 (9th Cir. 1979)) (internal quotation marks omitted). However, the Court must first consider the following three factors: "(1) the possible damage from granting the stay; (2) possible hardship or inequity of denying the stay; and (3) the orderly course of justice." *Rodriguez*, 2017 WL 3131845, at *4 (citing *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962); *McElrath v. Uber Technologies*, 2017 WL 1175591 *5 (N.D. Cal 2017)).

The Court agrees with Defendants that a stay is warranted, but only as to Davis's claims, not Plaintiff Moore or those similarly situated that she purports to represent. As the Honorable M. James Lorenz acutely observed:

> If the Supreme Court reverses *Morris*, [Davis] would have to bring [her] claims via individual arbitration. If the Supreme Court affirms, [Davis] would be able to bring [her] claims in this Court on a collective and class wide basis. Thus, the outcome of *Morris* will be dispositive as to whether arbitration or litigation in court is the proper method of dispute resolution here.

---

[7] The Court notes Davis's opposition "anticipate[d] that Defendants may attempt to request a stay because the Supreme Court has granted review of *Morris*" and argued against granting any such request for failing to raise the issue in their initial briefing. (Opp'n at p. 11.) However, in the interests of justice of judicial economy, the Court considers Defendants' request. Fed. R. Civ. P. 1.

8

*Rodriguez*, 2017 WL 3131845, at *4. Here, the possible damage from the stay is even more minimal than in *Rodriguez* because the Supreme Court's decision is imminent. Moreover, the only harm Davis will likely suffer as a result of a short stay is a delay in monetary recovery. In contrast, Defendants "will certainly incur significant legal fees and costs if forced to continue litigating [Davis's claims] in this Court. If the Supreme Court reverses the Ninth Circuit's decision in *Morris*, such fees and costs would largely constitute waste. So too would the scarce judicial resources that continued litigation would consume." *Id.*

In sum, because the "Arbitration Agreement" only applies to Davis's claims, the outcome of *Morris* only affects her claims, and therefore Defendants' request to stay is only granted as to Davis's claims.

## CONCLUSION

For the reasons set forth above, Defendants' motion to compel arbitration is **DENIED**, and Defendants' request to stay is **GRANTED in part**. Davis's claims are hereby **STAYED** pending the outcome of *Morris*. Defendants are ordered to notify the Court within **five (5) days** of the Supreme Court's decision in *Ernst & Young v. Morris*, 137 S. Ct. 809 (2017); their notice may include a request to reconsider the Court's denial of their motion to compel arbitration. Any such request is limited to three (3) pages, and must state the grounds upon which the request is made. If Defendants timely request reconsideration, Davis has **seven (7) days** from the date the request is filed to file a response of up to three (3) pages.

**IT IS SO ORDERED.**

Dated: May 9, 2018

Hon. Roger T. Benitez
United States District Judge